UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------x

UNIQUE LOGISTICS INTERNATIONAL (NYC), LLC,

          Docket No.

          Plaintiff,

  -against-                                     COMPLAINT

WILLIAMS SONOMA, INC.

          Jury Trial Demanded

          Defendant.

---------------------------------------------------------------------------x

UNIQUE LOGISTICS INTERNATIONAL (NYC), LLC, by its attorneys, Ross & Asmar LLC, Attorneys at Law, 499 Seventh Avenue, 23rd Floor, New York, New York 10018, for its complaint, respectfully alleges as follows:

1. UNIQUE LOGISTICS INTERNATIONAL (NYC), LLC ("Unique") is a corporation organized and existing under the laws of the State of New York with its principal place of business located at 154-09 146th Street, Jamaica, New York 11434.  Unique is in the business of providing freight forwarding services.

2. Upon information and belief, Williams Sonoma, Inc. ("WSI") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 3250 Van Ness Avenue, San Francisco, California.

3. This action is between citizens of different states.  The amount in controversy, exclusive of interest and costs, exceeds $150,000.00.  Therefore, jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. Section 1332.

4. Venue is deemed proper in this District pursuant to 28 U.S.C. Section 1391. A substantial part of the events giving rise to this action took place within the jurisdiction of this court.

5. WSI is in the business of selling retail consumer goods.

6. In or about August 2020, WSI contacted Unique in New York requesting that Unique provide ocean freight shipping services as an NVOCC to WSI.

7. Unique had not previously provided ocean freight services to WSI.

8. In August 2020, at a time when WSI faced severe backlog/congestion due to lack of capacity with WSI's existing ocean transport contractors, WSI asked for Unique to assist WSI with respect to badly needed ocean freight services.

9. WSI told Unique that it (WSI) needed support in arranging for ocean freight container for its inventory.

10. Unique stepped in and played a major part in keeping the WSI supply chain moving during difficult times.

11. Unique agreed to provide the requested ocean freight services as an NVOCC.

12. The terms of carriage for the transport of the WSI ocean freight containers were set forth in Unique's House Bill of Lading ("HBL"). Under WSI's instructions Unique was to ship on a 'Port to Port' basis. Thus, WSI took on responsibility to make its own arrangements to pick up containers from the terminals and transfer them to their distribution centers. Unique was not responsible for this service.

13. Other than the terms of carriage set forth in the HBL, no written contract was executed in connection with the transportation of ocean freight containers for WSI.

14. Unique agreed to provide WSI with a $5 Million credit limit ("the credit limit").

15. Unique specifically advised WSI that Unique could not extend credit to WSI beyond the credit limit.

16. WSI was told that it would have to keep its account receivable balance due to Unique under $5 Million (the credit limit).

17. In or about August 2020, Unique began providing ocean freight shipping services as an NVOCC for WSI.

18. Unique provided all ocean freight services competently and properly.

19. For services rendered, Unique sent invoices to WSI and/or WSI's agent for amount due from WSI to Unique for upload on WSI's En Vista portal.

20. WSI issued payment to Unique on invoices uploaded on the En Vista portal.

21. In 2021, WSI's balance due to Unique exceeded the credit limit.

22. On numerous occasions when WSI's credit with Unique exceeded the credit limit, Unique contacted WSI to advise WSI to make payment to reduce the account balance.

23. In 2021, Unique repeatedly reminded WSI of the credit limit and advised WSI of the need for Unique to strictly apply the credit limit.

24. Unique regularly kept WSI informed of the credit limit and WSI's need to make regular payments to reduce accounts receivable as Unique could not provide credit beyond the credit limit.

25. On numerous occasions, WSI's account balance due did extend beyond the credit limit.

26. Unique repeatedly informed WSI of the credit limit and WSI's need to make payments to reduce accounts receivable as Unique could not provide credit beyond the $5 Million.

27. Unique warned WSI that Unique could not extend credit beyond the stated credit limit and that Unique was not obligated to extend credit beyond the credit limit. Unique repeatedly warned WSI to make payment to reduce the receivable due to Unique.

28. Unique warned WSI that WSI inventory would not be released and that WSI would incur demurrage (storage) fees if payment was not made to reduce the WSI account receivable below the credit limit.

29. Unique warned WSI that WSI was responsible for any demurrage fees.

30. Unique advised WSI to settle demurrage fees directly or through their truckers so that WSI would not incur additional demurrage charges as Unique was not willing to advance credit beyond the credit limit.

31. Unique repeatedly advised WSI that Unique could not sustain or support WSI's financial outlays.

32. Unique advised WSI that any demurrage charges incurred because WSI refused to reduce the account balance due to Unique below the credit limit would be the responsibility of WSI.

33. Unique further advised that any demurrage fees which were paid by Unique were the responsibility of WSI.

34. Unique repeatedly advised WSI that Unique could not and would not advance further credit and that any demurrage charges advanced or any demurrage charges or other charges which might result from WSI's refusal to pay directly or to reduce its receivable below the credit limit were the responsibility of WSI.

35. Because Unique was not able to advance credit to WSI, and the WSI account receivable grew beyond its credit limit, ocean freight and demurrage charges could not be advanced, and further demurrage charges incurred.

36. Because WSI refused to pay demurrage directly, demurrage charges were incurred and paid by Unique.

37. Unique paid and is owed $4,745,988.53 in demurrage and other charges which WSI has not repaid to Unique.

38. These demurrage charges were caused by WSI's refusal to pay down its accounts receivable below the $5 Million credit limit and WSI's refusal to pick up its own inventory.

39. WSI incurred demurrage charges due to its failure to pick up its inventory and pay its demurrage on its own or to pay down the Unique accounts receivable below the agreed upon credit limit.

40. Unique paid $4,745,988.53 in demurrage and other freight related charges which WSI has not repaid to Unique.

41. The HBL specifically provides that WSI is responsible for all demurrage and freight related charges.

42. Unique had no obligation to advance demurrage or other freight related charges – and was clear to WSI that it would not advance credit beyond the credit limit.

43. Unique provided services to WSI pursuant to terms set forth on the HBL.

44. Unique performed all services for WSI.

45. WSI failed to pay demurrage charges which were incurred and charged to Unique.

46. Unique paid $4,745,988.53 in demurrage charges which WSI has not repaid to Unique.

47. WSI is responsible to pay $4,745,988.53 in demurrage charges to Unique.

48. By written demand, Unique made demand upon WSI for payment of $4,745,988.53.

49. Despite written demand, WSI has taken no action to pay the $4,745,988.53 due to Unique.

## AS AND FOR A SECOND CAUSE OF ACTION
### (ACCOUNT STATED)
### (As against WSI)

50. Unique repeats and realleges each and every allegation in the preceding paragraphs as if more fully set forth herein.

51. In August 2020, at a time when WSI faced severe backlog/congestion due to lack of capacity with WSI's existing ocean transport contractors, WSI asked Unique to assist WSI with respect to badly needed ocean freight shipping services.

52. WSI told Unique that it (WSI) needed support in arranging for ocean freight container for its inventory.

53. Unique stepped in and played a major part in keeping the WSI supply chain moving during difficult times.

54. Unique agreed to provide ocean freight shipping services as an NVOCC to WSI.

55. The terms of carriage for the transport of the WSI ocean freight containers were set forth in Unique's House Bill of Lading ("HBL").  Under WSI's instructions Unique was to ship on a 'Port to Port" basis. Thus, WSI took on responsibility to make its own arrangements to pick up containers from the terminals and transfer them to their distribution centers. Unique was not responsible for this service.

56. Other than the terms of carriage set forth in the HBL, no written contract was executed in connection with the transportation of ocean freight containers for WSI.

57. Unique agreed to provide WSI with a $5 Million credit limit ("the credit limit").

58. Unique specifically advised WSI that Unique could not extend credit to WSI beyond the credit limit.

59. WSI was told that it would have to keep its account receivable balance due to Unique under $5 Million (the credit limit).

60. In or about August 2020, Unique began providing ocean freight shipping services as an NVOCC for WSI.

61. Unique provided all ocean freight services competently and properly.

62. For services rendered, Unique sent invoices to WSI and/or WSI's agent for amount due from WSI to Unique for upload on WSI's En Vista portal.

63. WSI issued payment to Unique on invoices uploaded on the En Vista portal.

64. In 2021, WSI's balance due to Unique exceeded the credit limit.

65. On numerous occasions when WSI's credit with Unique exceeded the credit limit, Unique contacted WSI to advise WSI to make payment to reduce the account balance.

66. In 2021, Unique repeatedly reminded WSI of the credit limit and advised WSI of the need for Unique to strictly apply the credit limit.

67. Unique regularly kept WSI informed of the credit limit and WSI's need to make regular payments to reduce accounts receivable as Unique could not provide credit beyond the credit limit.

68. On numerous occasions, WSI's account balance due did extend beyond the credit limit.

69. Unique repeatedly informed WSI of the credit limit and WSI's need to make payments to reduce accounts receivable as Unique could not provide credit beyond the $5 Million.

70. Unique warned WSI that Unique could not extend credit beyond the stated credit limit and that Unique was not obligated to extend credit beyond the credit limit.  Unique repeatedly warned WSI to make payment to reduce the receivable due to Unique.

71. Unique warned WSI that WSI inventory would not be released and that WSI would incur demurrage (storage) fees if payment was not made to reduce the WSI account receivable below the credit limit.

72. Unique warned WSI that WSI was responsible for any demurrage fees.

73. Unique advised WSI to settle demurrage fees directly or through their truckers so that WSI would not incur additional demurrage charges as Unique was not willing to advance credit beyond the credit limit.

74. Unique repeatedly advised WSI that Unique could not sustain or support WSI's financial outlays.

75. Unique advised WSI that any demurrage charges incurred because WSI refused to reduce the account balance due to Unique below the credit limit would be the responsibility of WSI.

76. Unique further advised that any demurrage fees which were paid by Unique were the responsibility of WSI.

77. Unique repeatedly advised WSI that Unique could not and would not advance further credit and that any demurrage charges advanced or any demurrage charges or other charges which might result from WSI's refusal to pay directly or to reduce its receivable below the credit limit were the responsibility of WSI.

78. Because Unique was not able to advance credit to WSI, and the WSI account receivable grew beyond its credit limit, ocean freight and demurrage charges could not be advanced and further demurrage charges were incurred.

79. Because WSI refused to pay demurrage fees directly, demurrage charges and other charges were incurred and paid by Unique.

80. Unique paid and is owed $4,745,988.53 in demurrage charges which WSI has not repaid to Unique.

81. These demurrage charges were caused by WSI's refusal to pay down its accounts receivable below the $5 Million credit limit and WSI's refusal to pick up its own inventory.

82. WSI incurred demurrage charges due to its failure to pick up its inventory and pay its demurrage on its own or to pay down the Unique accounts receivable below the agreed upon credit limit.

83. Unique paid $4,745,988.53 in demurrage and other freight related charges which WSI has not repaid to Unique.

84. The HBL specifically provides that WSI is responsible for all demurrage and freight related charges.

85. Unique had no obligation to advance demurrage or other freight related charges – and was clear to WSI that it would not advance credit beyond the credit limit.

86. Unique provided services to WSI pursuant to terms set forth on the HBL.

87. Unique performed all services for WSI.

88. WSI failed to pay demurrage charges which were incurred and charged to Unique.

89. Unique paid $4,745,988.53 in demurrage charges which WSI has not repaid to Unique.

90. WSI is responsible to pay $4,745,988.53 in demurrage charges to Unique.

91. WSI has not paid Unique for the services rendered on the open invoices.

92. By written demand, Unique made demand upon WSI for payment of $4,745,988.53, the amount due on the open invoices.

93. Despite written demand, WSI has taken no action to pay the $4,745,988.53 due to Unique, the amount due on the open invoices.

94. WSI did not dispute or contest the amounts due on the open invoices.

95. WSI has failed to pay on the account stated in the amount of $4,745,988.53.

96. WSI is liable to Unique on an account stated in the amount of $4,745,988.53.

97. By reason of the aforesaid, Unique is entitled to recover $4,745,988.53 in damages, in addition to costs, expenses, disbursements, attorneys' fees and interest.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(BREACH OF CONTRACT)**
**(As against WSI)**

98. Unique repeats and realleges each and every allegation in the preceding paragraphs as if more fully set forth herein.

99. In August 2020, at a time when WSI faced severe backlog/congestion due to lack of capacity with WSI's existing ocean transport contractors, WSI asked Unique to assist WSI with respect to badly needed ocean freight services.

100. WSI told Unique that it (WSI) needed support in arranging for ocean freight container for its inventory.

101. Unique stepped in and played a major part in keeping the WSI supply chain moving during difficult times.

102. Unique agreed to provide the requested ocean freight shipping services as an NVOCC to WSI.

103. The terms of carriage for the transport of the WSI ocean freight containers were set forth in Unique's House Bill of Lading ("HBL"). Under WSI's instructions Unique was to ship on a 'Port to Port" basis. Thus, WSI took on responsibility to make its own arrangements to pick up containers from the terminals and transfer them to their distribution centers. Unique was not responsible for this service.

104. Other than the terms of carriage set forth in the HBL, no written contract was executed in connection with the transportation of ocean freight containers for WSI.

105. Unique agreed to provide WSI with a $5 Million credit limit ("the credit limit").

106. Unique specifically advised WSI that Unique could not extend credit to WSI beyond the credit limit.

107. WSI was told that it would have to keep its account receivable balance due to Unique under $5 Million (the credit limit).

108. In or about August 2020, Unique began providing ocean freight shipping services as an NVOCC for WSI.

109. Unique provided all ocean freight services competently and properly.

110. For services rendered, Unique sent invoices to WSI and/or WSI's agent for amount due from WSI to Unique for upload on WSI's En Vista portal.

111. WSI issued payment to Unique on invoices uploaded on WSI's En Vista portal.

112. In 2021, WSI's balance due to Unique exceeded the credit limit.

113. On numerous occasions when WSI's credit with Unique exceeded the credit limit, Unique contacted WSI to advise WSI to make payment to reduce the account balance.

114. In 2021, Unique repeatedly reminded WSI of the credit limit and advised WSI of the need for Unique to strictly apply the credit limit.

115. Unique regularly kept WSI informed of the credit limit and WSI's need to make regular payments to reduce accounts receivable as Unique could not provide credit beyond the credit limit.

116. On numerous occasions, WSI's account balance due did extend beyond the credit limit.

117. Unique repeatedly informed WSI of the credit limit and WSI's need to make payments to reduce accounts receivable as Unique could not provide credit beyond the $5 Million.

118. Unique warned WSI that Unique could not extend credit beyond the stated credit limit and that Unique was not obligated to extend credit beyond the credit limit. Unique repeatedly warned WSI to make payment to reduce the receivable due to Unique.

119. Unique warned WSI that WSI inventory would not be released and that WSI would incur demurrage (storage) fees if payment was not made to reduce the WSI account receivable below the credit limit.

120. Unique warned WSI that WSI was responsible for any demurrage fees.

121. Unique advised WSI to settle demurrage directly or through their truckers so that WSI would not incur additional demurrage charges as Unique was not willing to advance credit beyond the credit limit.

122. Unique repeatedly advised WSI that Unique could not sustain or support WSI's financial outlays.

123. Unique advised WSI that any demurrage charges incurred because WSI refused to reduce the account balance due to Unique below the credit limit would be the responsibility of WSI.

124. Unique further advised that any demurrage fees which were paid by Unique were the responsibility of WSI.

125. Unique repeatedly advised WSI that Unique could not and would not advance further credit and that any demurrage charges advanced or any demurrage or other charges which might result from WSI's refusal to pay directly or to reduce its receivable below the credit limit were the responsibility of WSI.

126. Because Unique was not able to advance credit to WSI, and the WSI account receivable grew beyond its credit limit, ocean freight and demurrage charges could not be advanced and further demurrage charges were incurred.

127. Because WSI refused to pay demurrage directly, demurrage charges were incurred and paid by Unique.

128. Unique paid and is owed $4,745,988.53 in demurrage and other charges which WSI has not repaid to Unique.

129. These demurrage charges were caused by WSI's refusal to pay down its accounts receivable below the $5 Million credit limit and WSI's refusal to pick up its own inventory.

130. WSI incurred demurrage charges due to its failure to pick up its inventory and pay its demurrage on its own or to pay down the Unique accounts receivable below the agreed upon credit limit.

131. Unique paid $4,745,988.53 in demurrage and other freight related charges which WSI has not repaid to Unique.

132. The HBL specifically provides that WSI is responsible for all demurrage and freight related charges.

133. Unique had no obligation to advance demurrage or other freight related charges – and was clear to WSI that it would not advance credit beyond the credit limit.

134. By written demand, Unique made demand upon WSI for payment of $4,745,988.53, the amount due on the open invoices.

135. WSI has breached the terms of the agreement between the parties.

136. Despite written demand, WSI has taken no action to pay the amounts due to Unique.

137. WSI breached the terms of the contractual agreement between WSI and Unique.

138. By reason of the aforesaid, Unique has been damaged in the amount of $4,745,988.53.

139. By reason of the aforesaid, WSI has breached the contract with Unique and Unique is entitled to recover $4,745,988.53 in damages, in addition to costs, expenses, disbursements, attorneys' fees and interest.

### AS AND FOR A THIRD CAUSE OF ACTION
### (UNJUST ENRICHMENT)
### (As against WSI)

140. Unique repeats and realleges each and every allegation in the preceding paragraphs as if more fully set forth herein.

141. In August 2020, at a time when WSI faced severe backlog/congestion due to lack of capacity with WSI's existing ocean transport contractors, WSI asked for Unique to assist WSI with respect to badly needed ocean freight services.

142. WSI told Unique that it (WSI) needed support in arranging for ocean freight container for its inventory.

143. Unique stepped in and played a major part in keeping the WSI supply chain moving during difficult times.

144. Unique agreed to provide ocean freight shipping services as an NVOCC to WSI.

145. The terms of carriage for the transport of the WSI ocean freight containers were set forth in Unique's House Bill of Lading ("HBL"). Under WSI's instructions Unique was to ship on a 'Port to Port" basis. Thus, WSI took on responsibility to make its own arrangements to pick up containers from the terminals and transfer them to their distribution centers. Unique was not responsible for this service.

146. Other than the terms of carriage set forth in the HBL, no written contract was executed in connection with the transportation of ocean freight containers for WSI.

147. Unique agreed to provide WSI with a $5 Million credit limit ("the credit limit").

148. Unique specifically advised WSI that Unique could not extend credit to WSI beyond the credit limit.

149. WSI was told that it would have to keep its account receivable balance due to Unique under $5 Million (the credit limit).

150. For services rendered, Unique sent invoices to WSI and/or WSI's agent for amount due from WSI to Unique for upload on WSI's En Vista portal.

151. WSI issued payment to Unique on invoices uploaded on the En Vista portal.

152. In 2021, WSI's balance due to Unique exceeded the credit limit.

153. On numerous occasions when WSI's credit with Unique exceeded the credit limit, Unique contacted WSI to advise WSI to make payment to reduce the account balance.

154. In 2021, Unique repeatedly reminded WSI of the credit limit and advised WSI of the need for Unique to strictly apply the credit limit.

155. Unique regularly kept WSI informed of the credit limit and WSI's need to make regular payments to reduce accounts receivable as Unique could not provide credit beyond the credit limit.

156. On numerous occasions, WSI's account balance due did extend beyond the credit limit.

157. Unique repeatedly informed WSI of the credit limit and WSI's need to make payments to reduce accounts receivable as Unique could not provide credit beyond the $5 Million.

158. Unique warned WSI that Unique could not extend credit beyond the stated credit limit and that Unique was not obligated to extend credit beyond the credit limit. Unique repeatedly warned WSI to make payment to reduce the receivable due to Unique.

159. Unique warned WSI that WSI inventory would not be released and that WSI would incur demurrage (storge) fees if payment was not made to reduce the WSI account receivable below the credit limit.

160. Unique warned WSI that WSI was responsible for any demurrage fees.

161. Unique advised WSI to settle demurrage fees directly or through their truckers so that WSI would not incur additional demurrage charges as Unique was not willing to advance credit beyond the credit limit.

162. Unique repeatedly advised WSI that Unique could not sustain or support WSI's financial outlays.

163. Unique advised WSI that any demurrage charges incurred because WSI refused to reduce the account balance due to Unique below the credit limit would be the responsibility of WSI.

164. Unique further advised that any demurrage fees which were paid by Unique were the responsibility of WSI.

165. Unique repeatedly advised WSI that Unique could not and would not advance further credit and that any demurrage charges advanced or any demurrage or other charges which might result from WSI's refusal to pay directly or to reduce its receivable below the credit limit were the responsibility of WSI.

166. Because Unique was not able to advance credit to WSI, and the WSI account receivable grew beyond its credit limit, ocean freight and demurrage charges could not be advanced and further demurrage was incurred.

167. Because WSI refused to pay demurrage directly, demurrage charges were incurred and paid by Unique.

168. Unique paid and is owed $4,745,988.53 in demurrage and other charges which WSI has not repaid to Unique.

169. These demurrage charges were caused by WSI's refusal to pay down its accounts receivable below the $5 Million credit limit and WSI's refusal to pick up its own inventory.

170. WSI incurred demurrage charges due to its failure to pick up its inventory and pay its demurrage on its own or to pay down the Unique accounts receivable below the agreed upon credit limit.

171. Unique paid $4,745,988.53 in demurrage charges which WSI has not repaid to Unique.

172. The HBL specifically provides that WSI is responsible for all demurrage charges.

173. Unique had no obligation to advance demurrage charges – and was clear to WSI that it would not advance credit beyond the credit limit.

174. Unique provided services to WSI pursuant to terms set forth on the HBL.

175. Unique performed all services for WSI.

176. WSI failed to pay demurrage charges which were incurred and charged to Unique.

177. Unique paid $4,745,988.53 in demurrage and other freight related charges which WSI has not repaid to Unique.

178. WSI is responsible to pay $4,745,988.53 in demurrage and freight related charges to Unique.

179. By written demand, Unique made demand upon WSI for payment of $4,745,988.53.

180. By reason of the aforesaid, WSI has been unjustly enriched in an amount equal to $4,745,988.53 and Unique has been damaged in an amount equal to $4,745,988.53.

181. By reason of the aforesaid, Unique is entitled to damages in the amount $4,745,988.53, with additional costs, expenses, disbursements, attorneys' fees and interest.

**WHEREFORE**, claimant Unique respectfully demands judgment against WSI, as follows:

(a) On the First Cause of Action, the sum of $4,745,998.53 with additional costs, expenses, disbursements, attorneys' fees and interest;

(b) On the Second Cause of Action, the sum of $4,745,998.53 with additional costs, expenses, disbursements, attorneys' fees and interest;

(c) On the Third Cause of Action, the sum of $4,745,998.53 with additional costs, expenses, disbursements, attorneys' fees and interest;

(d) The costs, expenses, disbursements and fees of this action including attorneys fees and interest, and such other and further relief as this Court deems just and proper.

JURY DEMAND: Demand is hereby made for trial by jury of all issues herein.

Dated: New York, New York
July 18, 2022

        ROSS & ASMAR LLC
        ATTORNEYS AT LAW

By: *[signature: Steven B. Ross]*
Steven B. Ross (SR 5059)
499 Seventh Avenue, 23rd Floor
New York, NY 10018
Attorneys for Plaintiff
(212) 736-4202
(212) 736-2872 facsimile
steven@rossasmar.com